

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00085-CV

———————————————

ANGELIA ARBUCKLE, Appellant

V.

WICHITA COUNTY TEXAS ADULT PROBATION, Appellee

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CV2020-2437

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Opinion by Chief Justice Sudderth

## OPINION

The question presented in this case is whether an adult probation officer falls within Texas Family Code Chapter 261's definition of "professional" and is therefore protected from being terminated after reporting a suspected incident of child abuse. Because we hold that she is not, we affirm the trial court's granting of Appellee Wichita County's plea to the jurisdiction.

## I. Background

On December 23, 2019, Appellant Angelia Arbuckle, a Community Supervision Officer[1] in the Wichita County Adult Probation Department, discovered information in a probationer's file that led her to make a report with Texas Child Protective Services (CPS) related to abuse or neglect of a child. *See* Tex. Fam. Code Ann. § 261.101(a) (requiring "a person having reasonable cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person" to "immediately make a report" to CPS). Pursuant to Section

---

[1]The terms "community supervision officer," and "adult probation officer" are synonymous. *State v. Posey*, 330 S.W.3d 311, 312 n.1 (Tex. Crim. App. 2011) ("We note that in 1993, during the 73rd Legislative Session, the statutory term for probation was changed to 'community supervision.' Both terms refer to the same process and will be used interchangeably in this opinion."); *State v. Wilson*, 324 S.W.3d 595, 596 n.2 (Tex. Crim. App. 2010) (similar); *see also Garcia v. State*, No. 02-15-00138-CR, 2017 WL 370924, at *1 n.2 (Tex. App.—Fort Worth Jan. 26, 2017, pet. ref'd) (mem. op., not designated for publication) ("The terms 'probation' and 'community supervision' share the same meaning and are generally used interchangeably."). When framing the question presented on appeal, Arbuckle characterizes herself as an adult probation officer, and for ease of analysis, hereafter we will refer to Arbuckle's occupation as that of an "adult probation officer."

261.201, Arbuckle's identity as the person making the report was "confidential" and "not subject to public release." *Id.* § 261.201(a)(1).

After a CPS investigator contacted her four days later, Arbuckle noted in the probationer's record that she had been contacted by the investigator and the nature of the contact. A few days after making that notation, Arbuckle's supervisor, Danette Craig, directed Arbuckle to supplement the documentation in the probationer's file to include that Arbuckle had made the initial report and the substance of what Arbuckle had reported to CPS. Arbuckle refused, asserting rights to confidentiality and privilege protected by statute. Later that day, Arbuckle was called into a meeting with department head Kirk Wolfe, who asked Arbuckle to "explain what the situation was." According to Arbuckle, once again she invoked her "reporter confidentiality privilege" and refused to supplement the probationer's record with the requested information. Wolfe responded by informing her that he was "tired of her insubordination," and he terminated her.

Arbuckle sued Wichita County for wrongful termination, claiming that she "was retaliated against because she made a report to CPS." Wichita County responded with a plea to the jurisdiction in which it asserted sovereign immunity,[2]

---

[2]Although both Arbuckle and Wichita County use the term "sovereign immunity" in their briefs, technically speaking, the immunity enjoyed by a political subdivision, such as a county, is referred to as "governmental immunity," while the immunity enjoyed by the state is "sovereign immunity." *Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 374 (Tex. 2006). The standards are the same, and for ease of

3

arguing that Arbuckle was not a "professional" who made a good faith report of child abuse or neglect and that because sovereign immunity is statutorily waived only as to actions filed by a "professional," sovereign immunity had not been waived as to Arbuckle's suit against Wichita County. *See id.* §§ 261.101(b), .110(b), (f). The trial court granted Wichita County's plea to the jurisdiction and dismissed Arbuckle's lawsuit. Arbuckle appeals.

## II. The Law

### A. Subject Matter Jurisdiction

Whether a court has subject matter jurisdiction is a question of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The burden is on a pleader to "allege[] facts that affirmatively demonstrate a trial court's subject matter jurisdiction." *Id.* Whether that burden has been met is also a question of law that is reviewed de novo. *Id.* Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction. *Id.* at 225–26.

### B. Sovereign Immunity

Generally speaking, governmental entities, including subdivisions of the state such as Wichita County, enjoy sovereign immunity from suits seeking to impose tort liability upon them. *City of San Antonio v. Tenorio*, 543 S.W.3d 772, 775 (Tex. 2018);

reference, we use the phrase "sovereign immunity" here. *See id.* at 374 n.1 (doing similarly).

4

*Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (citing *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003)). Sovereign immunity deprives a court of subject matter jurisdiction unless the party suing the governmental entity establishes that the state has consented to suit by specifically waiving its immunity. *Fort Worth Indep. Sch. Dist. v. Palazzolo*, No. 02-18-00205-CV, 2019 WL 2454866, at *7 (Tex. App.—Fort Worth June 13, 2019, pet. denied) (mem. op.) (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)).

Government may consent to suit through state laws, but such statutory consent must be expressed in clear and unambiguous language. *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 353 (Tex. 2013). And in considering the statutory language, we are cognizant that statutory waivers are to be construed narrowly.[3] *Id.*

## C. Texas Family Code Chapter 261

Family Code Chapter 261 carves out a narrow waiver of sovereign immunity for those who seek protection from adverse employment action related to a good faith report of child abuse or neglect: "Sovereign immunity is waived and abolished to the extent of liability created by this section." *Id.* § 261.110(b), (f). But because the liability created by Chapter 261 applies only to "professionals," for Arbuckle's action

---

[3]Arbuckle urges us to construe Section 261.110 liberally because it is a remedial statute, but she cites no authority that the general rule regarding liberal construction of remedial statutes trumps the specific, well-established rule that statutory waivers of sovereign immunity should be construed narrowly. We decline to apply a liberal construction to Section 261.110.

to fall within the waiver, she must have been a "professional," as defined by the statute, with regard to the adverse action about which she complained. Otherwise, her suit cannot survive Wichita County's plea.

A "professional" is defined as one who, in her official duties, has direct contact with children:

> In this subsection, "professional" means an individual who is licensed or certified by the state or who is an employee of a facility licensed, certified, or operated by the state[4] and who, in the normal course of official duties or duties for which a license or certification is required, has direct contact with children. The term includes teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provides reproductive services, juvenile probation officers, and juvenile detention or correctional officers.

*Id.* § 261.101(b).

## D. Statutory Construction

The objective of statutory construction is to give effect to the legislature's intent. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017). We engage in a de novo review which begins with a look at the plain language of the statute. *Id.* Absent ambiguity, our analysis will end there, as the supreme court has instructed us to give a statute its plain meaning. *Id.* Additionally, in looking at the statute, we presume that each word contained therein has a purpose and that when the legislature has omitted a word from the statute, it did so purposefully. *Id.*

---

[4]The parties do not dispute that Arbuckle was certified by the Texas Department of Criminal Justice as an adult probation officer.

6

## III. Argument and Analysis

In Arbuckle's response to Wichita County's plea to the jurisdiction and on appeal, she argues that she satisfied the statutory definition of "professional" because, through her normal course of duties, she had direct contact with children. Specifically, Arbuckle points out that, according to her official job summary,[5] as a part of her normal course of duties, she was required to:

- Conduct field visits with offenders, which, according to Arbuckle, required her to "interact[] with the residents of the home," including both adults and children;

- Conduct monthly office visits, during which times, Arbuckle contends, probationers "commonly [brought] other individuals with them," including children;

- Attend court hearings and trials on occasion, which Arbuckle argues involved "interacting with the probationers and their families," including children; and

- Possess and demonstrate skills designed to establish a "professional rapport" with probationers to build trust and to encourage behavioral change, which Arbuckle claims could not be achieved without "interact[ion] with [the] probationer's children."

---

[5]Arbuckle cites to the "Duties and Responsibilities" section of the "Wichita County Community Supervision and Corrections Department (CSCD) Position Description," which was attached to Wichita County's plea to the jurisdiction.

Arbuckle also argues that these duties and responsibilities "[were] not exhaustive."

Specifically, she points to her job summary, which states, "[t]he statements contained in this job description . . . . should not be considered an all-inclusive listing of work requirements." Thus, Arbuckle reasons, "even if the duty of interacting with children [was] not specifically included in [her] job duties, it [could] be implied as a required duty in carrying out the other express duties."[6]

Additionally, Arbuckle points out that her contact with children was not restricted in any way, and in fact, she was subject to many provisions in the Code of Criminal Procedure that are designed "to protect children from probationers on community supervision."[7] But Arbuckle falls short of pointing to specific provisions

_____

[6]Because we hold that Arbuckle did not meet the definition of "professional," we need not reach the issue of whether implied job duties would obviate the need for proof sufficient to raise a fact issue to defeat Wichita County's plea to the jurisdiction. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018) (applying a traditional summary judgment standard of review to a plea to the jurisdiction that challenges the existence of jurisdictional facts such that respondent "must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction" (quoting *Tex. Dep't of Parks & Wildlife*, 133 S.W.3d at 221)).

[7]Arbuckle cites specifically to Texas Code of Criminal Procedure Article 42A.054(a) (excluding from eligibility for judge-ordered community supervision defendants who have been found guilty of certain offenses, including offenses against children), Article 42A.251(2) (defining the term "sex offender" to include persons convicted of certain offenses against children), Article 42A.453(c) (requiring a judge to establish a child safety zone applicable to a defendant who has been placed on community supervision for certain offenses against children), and Articles 42A.502–.513 (permitting or requiring a judge to impose certain conditions on defendants who have been placed on community supervision for certain offenses, including offenses against children).

in the Code of Criminal Procedure that require adult probation officers to interact directly with children in the normal course of their duties, nor does she respond to the plea with any proof of direct interactions with children required by the Code to be done in the normal course of her duties.

She further argues that because the list of professionals included in Section 261.101(b) is not an "all-inclusive" list, rules of construction should be used to determine if an adult probation officer falls within the meaning of "professional." Applying the rule of construction *ejusdem generis*, she pointed out to the trial court that the examples of professionals included in the statute share a common feature—they all "work for the health, safety, and legal protection of families." She reasons that because adult probation officers also work for the health, safety, and legal protection of families, they, too, should be considered "professionals," as that term is defined in Chapter 261.

Finally, relying on Family Code Section 153.001(a)(1–2), Arbuckle argued to the trial court that it would be a threat to public safety and violative of public policy to hold that she is not a "professional" as defined by the statute:

> The public policy of the State is to: "assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child [and] . . . provide a safe, stable, and nonviolent environment for the child." Here, [Arbuckle] assists in carrying out these policies by examing [sic] the parent[']s ability to act in the best interest of a child, and, more importantly, conducting field visits to ensure the child lives in a safe, stable, and nonviolent environment. Therefore, a holding that a CSO is not a "professional" as defined in 261.101(b) would result in a restricted ability to report for CSO's. This

9

would lead to unsafe, unstable, and violent environments for children. [Internal citations omitted.]

When construing a statute, its unambiguous language controls, and "words not statutorily defined bear their common, ordinary meaning." *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 261 (Tex. 2018). And "to determine a statutory term's common, ordinary meaning, we typically look first to [its] dictionary definitions." *Id.* (quoting *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)).

The terms "direct contact with children" and "normal course of official duties," are not statutorily defined. Because the statute does not provide a definition we must consider the common, ordinary meaning of these terms. *See id.* And in looking to the common, ordinary meaning of the words, "direct" and "normal," we turn to the dictionary for guidance. *See id.*

The term "direct" is defined as something that is "transmitted back and forth without an intermediary," as in "engaged in a *direct* exchange of recriminations." *See Direct*, Webster's Third New International Dictionary 640 (2002). The term is also defined as "marked by absence of an intervening agency, instrumentality, or influence," "made, carried on, or effected without any intruding factor or intervening step," and "unhampered by divergent, intervening, or separative forces," as in "he had more *direct* access to the governor than the legislators." *Id.* It is also defined as something that is "effected by one object or substance in contact with another with

10

no insulating or obstructing element between," as in "there is no *direct* connection between the apartments." *Id.* A common thread among these definitions appears to be the absence of any barrier between the two persons, places, or things in question.

Applying this meaning to the word "direct" in the context of "direct contact with children"—which, according to Section 261.101(b), includes "teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provides reproductive services, juvenile probation officers, and juvenile detention or correctional officers"—"direct" describes a type of contact with children where there is or may be no barrier between the employee and the child. *See* Tex. Fam. Code Ann. § 261.101(b). It describes the type of contact that is or may be free from the presence or intercession of parents or guardians of the children. Arbuckle's description of her contact with children lacks this component. In all four situations that Arbuckle contends demonstrated her "direct" contact with children—field visits, home visits, court appearances, and establishing a rapport with probationers—any potential contact with the children was not direct, because the children were in the presence of the probationer and under the probationer's, not Arbuckle's, supervision and intermediation. We agree with Wichita County's observation that Arbuckle's contact with children as an adult probation officer was tangential at best.

Nor do we think that whatever contact she had with children was part of Arbuckle's "*normal* course of official duties." *Id.* (emphasis added). "Normal" is defined in the dictionary as "conformed to a type, standard, or regular pattern," as in

11

"*normal* working hours." *Normal*, Webster's Third New International Dictionary 1540 (2002). This definition envisions an activity that is repetitive and predictably present. For something to fit within the "normal course of official duties or duties for which a license or certification is required," then, it must be something that occurs repetitively and predictably, not merely on occasion or in isolation. *See* Tex. Fam. Code Ann. § 261.101(b). In other words, a normal occurrence is something that a person is not merely prepared to handle if it should arise, but it is something that a person expects to arise and handle under many, if not most, circumstances. Again, all four situations that Arbuckle points to in support of her argument that direct contact with children was part of her "normal course of official duties" involved only a possibility or potential that children might be present when official duties were being performed.

Finally, in construing a statute, we are mindful that just as "every word of a statute must be presumed to have been used for a purpose[;] [l]ikewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) (internal citations omitted). Here, the statute specifically provides that "juvenile probation officers" are "professionals" within the meaning of the statute. The statute does not list "adult probation officers," nor does it merely refer to "probation officers" in general. We presume that the legislature modified the term "probation officers" by including the word "juvenile" intentionally; and we presume that the legislature intentionally omitted the word "adult" as a modifier as well. Thus, we

12

conclude that the legislature intentionally excluded adult probation officers from the list of professionals whom the statute was meant to include.

We hold that an adult probation officer does not fall within Texas Family Code Section 261.101(b)'s definition of "professional"; thus, Texas Family Code Section 261.110(f)'s sovereign immunity waiver does not apply to Arbuckle's claim against Wichita County.

## IV. Conclusion

Having held that Arbuckle is not a "professional" for which sovereign immunity had been waived, we affirm the trial court's order granting Wichita County's plea to the jurisdiction.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: February 17, 2022